JOHN R. GIBSON, Circuit Judge,
dissenting.
Midwestern Machinery contends that, beginning in the second half of 1993, Northwest deliberately and dramatically changed its use of a key asset (or bundle of assets) it obtained from Republic-its Minneapolis hub-and began to exploit that asset to lessen competition in a way that injured Midwestern Machinery. Both the district court and this Court have disposed of a factual issue, supported by expert reports, independent studies, and statistical evidence, on summary judgment. Neither court fulfills the duty to judge a summary judgment motion “viewing the evidence and drawing all inferences in the light most favorable to the party opposing the motion.” See Viking Supply v. Nat’l Cart Co., 310 F.3d 1092, 1096 (8th Cir.2002). Accordingly, I respectfully dissent.
The district court disposed of Midwestern Machinery’s hub exploitation argument in one sentence: “Specifically, Plaintiffs assert that the 1993 spike in Northwest’s hub fare premium constitutes a new overt act of anti-competition; however, Plaintiffs own experts point to a number of factors that might have contributed to the increase in hub fare premiums, none of which involves new or different uses of the merger assets.” Op. at 270-71 (emphasis added). The Court today devotes three sentences to the hub exploitation argument: “Midwestern also suggests that market innovations such as the pricing program that Northwest employed after 1993 exemplify its different use of market power. Such a theory, however, would preclude merged firms from responding to changes in market conditions and opportunities. This makes scant sense.” Supra at 12.
Both the district court and this Court thus resolved the hub exploitation argument without addressing the considerable body of evidence supporting Midwestern Machinery’s assertions. The district court did so by requiring the plaintiffs evidence to rule out the existence of influences which might have contributed to the change in prices that experts and independent scholars say resulted from Northwest’s exploitation of the “fortress hub” it acquired in the merger. Our Court does so by a naked policy judgment-that punishing firms for responding to changes in *279 market conditions and opportunities is intolerable-apparently without regard to whether such responses violate the Clayton Act.
Midwestern Machinery’s experts arrayed evidence that would allow a finder of fact to arrive at the following conclusions:
(1) Before the merger with Republic, Northwest did not have dominance over the Minneapolis airport, but competed with Republic.[2]
(2) After the merger, the new Northwest controlled around 75% of the gates at the Minneapolis airport,[3] carried 79% of Minneapolis passengers,[4] and became the only carrier serving 19 routes out of Minneapolis.[5]
(3) Market power results from a highly concentrated market or high market share, combined with barriers to entry of that market by competitors.[6]
(4) Control of airport gates is an important entry barrier to new entrants at some airports, and in particular, at the Minneapolis airport.[7]
(5) Possession of a “fortress hub” domi *280 nated by one carrier[8] can create an entry barrier by giving the dominant carrier a frequency-of-flights advantage that puts new entrants at a competitive disadvantage[9] and by locking in customers and travel agents through frequent flyer and “frequent booker” programs.[10]
(6) General economic conditions and Northwest’s own financial situation prevented it from effectively exploiting its market power until 1993.[11]
(7) Beginning in the second half of 1993, there was a great leap in Northwest’s exploitation of its market power at Minneapolis, as demonstrated by its greatly increased supra-competitive profit margins or “hub premiums.”[12] This increase in premiums corresponded with a new strategy by Northwest to reduce the sphere in which it competed and concentrate on its fortress hubs.[13]
(8)Also beginning in 1993, Northwest responded to a new problem-the upsurge of low-fare new entrant airlines-by various strategies that involved exploitation of its fortress hub at Minneapolis.[14]
These propositions, which are supported by expert opinions backed up by data and academic and governmental studies, suffice to show that beginning within the four-year limitations period, Northwest made a new use of assets gained in the merger to stifle competition and reap monopoly profits. Midwestern Machinery’s claim should survive summary judgment under the *281 Clayton Act standards articulated in an earlier stage of this case, Midwestern Machinery, Inc. v. Northwest Airlines, Inc., 167 F.8d 439, 442-43 (8th Cir.1999), and in Concord Boat Corp. v. Brunswick Corp., 207 F.Sd 1039, 1050-51 (8th Cir.2000).
The Court today does not repudiate or gainsay the legal standards set out in Midwestern Machinery and Concord Boat, that a cause of action for holding and use of merger assets accrues when the threat of restraint or monopoly first becomes evident and the plaintiff suffers injury thereby. Midwestern Machinery, 167 F.3d at 443; Concord Boat, 207 F.3d at 1051. The Court states, “[O]nly different uses of assets can justify restarting the statute of limitations.” Supra at 8.[15] Accordingly, I have no need to argue about legal standards. Instead, my concern is with the Court’s treatment of the facts. The Court says that plaintiffs did not adduce evidence of the facts alleged. In particular, the Court says that the plaintiffs did not show that they used assets gained in the merger to threaten competition and that they did not show they used the assets differently during the limitations period (1993 and after) than they did during the preceding, time-barred period. The Court can only reach these conclusions by ignoring a great deal of evidence to the contrary.
First, the Court says that market power is not an asset, but the result of possession of other assets. Supra at 11. Northwest’s experts did opine that Northwest gained market power as a result of the merger, but they made it clear that the market power came from assets acquired in the merger, such as Republic’s gate leases at the Minneapolis airport.[16] When the plaintiffs’ economists use the term “market power” in this case, they use it as a proxy for the constellation of assets such as gate leases that make up a “fortress hub.” Therefore, we need not worry about whether market power is itself an asset, since it results from control of property and rights that are indubitably assets. The Court’s point goes only to the words used, not to the substance of what the plaintiffs’ evidence showed.
Second, the Court says that the plaintiffs did not show that they made a distinctive use of the assets during the limitations period that differed from their use of the assets during the time-barred period. But the plaintiffs did show this. The plaintiffs introduced evidence that Northwest’s use of the Minneapolis hub varied in three time periods. Because this case was decided on summary judgment, I will recount the evidence in the light most favorable to the plaintiffs.
Before the merger, Northwest did not control a majority of the gates at Minneapolis or the flights arriving and departing from there. Before the merger, Northwest was not able to charge a premium above the competitive price for Minne *282 apolis flights, because it had to compete with Republic.[17]
Upon acquiring Republic, Northwest gained a dominant position at the Minneapolis airport.[18] In the period between the merger and 1994, Northwest did charge a premium (above the weighted national average price) for Minneapolis flights, but it was a relatively small premium.[19] A plaintiffs expert explained that factors such as the 1991-1992 recession and Northwest’s own financial difficulties prevented Northwest from making effective use of its control of the Minneapolis hub to extract a large monopoly premium there.[20]
Beginning in June 1993, Northwest responded to new developments, in part by using the Minneapolis hub it gained in the merger. Several conditions combined to allow this new use of the Minneapolis hub.
First, it took some time after airline deregulation for experience to accrue demonstrating the competitive advantages for an airline of dominating a hub airport. The NorthwesNRepublic merger was part of a wave of airline mergers in the 1980’s. The Northwest-Republic merger was al-
lowed by the Department of Transportation, over Department of Justice protest, because the DOT believed in the theory of “contestability” — that new carriers could easily enter new markets and therefore the specter of competition would discipline dominant carriers.[21] As history unfolded, the theory was disproved.[22] Michael E. Levine, of the Yale School of Management, wrote an influential article in 1987 concluding that hubs were important sources of competitive advantage for airlines and describing means by which airlines with strong hubs exploited that advantage. See Michael E. Levine, “Airline Competition in Deregulated Markets: Theory, Firm Strategy, and Public Policy,” 4 Yale Journal of Regulation 393 (1987). Northwest hired Levine in 1992 as Executive Vice President for Marketing. Levine determined that Northwest should abandon its previous strategy of competing with the three biggest airlines on their own turf and concentrate on reaping the advantages of Northwest’s existing strong hubs. Davis Dyer and Len Schlesinger, “Northwest Airlines: Coping with Change,” Har-
*283 vard Business School, No. 9-897-027 at 10 (1997).
Second, the industry developed new yield management systems that allowed airlines to monitor ticket sales and instantly respond to exploit particular market opportunities. In 1994, Northwest put in place newly developed yield management computer systems which allowed Northwest to manipulate pricing on threatened routes by offering more seats at already-established low fares, thus responding to new entrants without sparking a general price war.[23]
Third, a new type of airline entered the picture. “In the wake of the economic recovery from the Gulf War recession, the U.S. airline industry in 1993-94 experienced a significant upsurge in applications and entry by low-fare new entrant airlines, typically operating with lower costs and offering service at significantly lower fares than the major network airlines.”[24] Where such airlines were able to establish routes at a hub, hub premiums collected by the dominant carrier declined.[25]
In response to this new threat, Northwest used its control of the Minneapolis hub to chase out low-fare entrants by price cuts focused on the entrant’s routes and by swamping the challenged routes with flights and seats.[26] Northwest’s size advantage over the entrants, which obviously resulted in part from the merger, gave Northwest the financial staying power to engage in targeted price cuts so that the new entrants could not sustain a pricing advantage or even price parity.[27] Using the sophisticated yield management systems now available, Northwest could focus price responses on the particular routes challenged without sparking an industry- *284 wide price war.[28] In at least one case, Northwest cut fares on the challenged routes below variable cost until the new entrant gave up the route.[29] Facilities and equipment gained during the merger[30] gave Northwest the capacity to swamp the market with flights and seats,[31] so that the new entrants could not offer any scheduling advantage to travelers. Once the new entrant had been chased out of town, Northwest cut back its flights and raised its fares above the level where they had been before the new entrant’s challenge.[32]
The plaintiffs came forward with evidence that only within the limitations period did Northwest gain the knowledge, the technology, and the market conditions that allowed it to exploit the market power the Republic merger placed in its grasp. I cannot concur in affirming summary judgment on such a record.

. The expert report of John C. Beyer concerning statute of limitations issues stated:
Before their merger, Northwest and Republic were, respectively, the eighth and ninth largest airlines in the United States. Both firms had substantial operations at the Minneapolis/ St. Paul airport ("MSP”) and were, by far, the largest airlines serving MSP. The firms competed with one another for passengers on the routes in which they overlapped. And, each firm constrained the ability of the other to charge supracom-petitive prices on the routes in which they did not overlap because each could readily adjust their flight schedules and operations to take advantage of a profit opportunity on city-pair routes they were not serving at the time.
App. 20.

. At the time of the merger, the financial press reported that the merger would result in Northwest controlling 75-80% of the gates at Minneapolis. Lee A. Ohanian Report, App. 157. See also General Accounting Office, Airline Deregulation: Barriers to Entry Continue to Limit Competition in Several Key Domestic Markets 10 (Oct. 18, 1996) (showing 49 out of 65 gates at Minneapolis had been leased to Northwest).

. Minnesota Planning, Flight Plan: Airline Competition in Minnesota 3 (1999).

. Ohanian Report, App. 156-57 (quoting Dep't of Justice Report: "In 19 of [the 26 markets out of Minneapolis where Northwest and Republic provided most of the service] the merger would consolidate the only two airlines providing nonstop service, thereby eliminating all present competition.”).

. Beyer Report, App. 22 ("Where a concentrated market is coupled with barriers to entry ... one can infer the possession of market power by the dominant firm.”); Ohanian Report, App. 152 ("Market power requires a high market share and barriers to entry into the market.”).

. Beyer Report, App. 22; General Accounting Office, Airline Deregulation: Barriers to Entry, supra, at 9-11 (senior management at many start-up airlines said long-term, exclusive gate leases are barrier to entry at Minneapolis; showing 49 out of 65 gates at Minneapolis had been leased to Northwest; "The airports in Detroit, Newark, and Minneapolis were most frequently cited by the airlines that started after deregulation as having competition limited by constraints in gaining access to gates”; requirement of subleasing gates to gain entry to Minneapolis was "key factor” in Southwest's decision not to serve Minneapolis); Ohanian Report, App. 153 ("A key barrier to entry in the airline market is access to gates.”). A General Accounting Office report from 1999 stated that all gates at Minneapolis were subject to exclusive-use leases and that Northwest leased 54 of the 70 gates; airport officials stated that there were "no gates available” to new entrants. General Accounting Office, Airline Dergulation: Changes in Airfares, Service Quality, and Barriers to Entry 17 (March 4, 1999). See also Minnesota Planning, supra, at 3 ("The U.S. General Accounting Office found in 1996 that long-term, exclusive-use gate leases seriously inhibit competition at Minneapolis-St. Paul. At airports where most gates are tied up in such leases, new entrants are often forced to *280 sublease gates, which usually results in gate access at less desirable times and higher cost.”)

. The term "fortress hub” is used in the airline industry to describe hubs in which one carrier has a dominant share of flights or services. John S. Strong Report, App. 202 n.8.

. "[S]tudies have shown that a carrier with a frequency advantage in a market gains a disparate share of local traffic, which compounds the competitive problem for other carriers that compete at the network hub. When carriers with similar cost characteristics do not have access to the same traffic flows, they are unable to compete.” Department of Transportation, Office of Aviation and International Economics, The Low Cost Airline Service Revolution 27 (April 1996).

. Severin Borenstein, Hub Dominance and Pricing 4-5 (1999).

. Ohanian Report, App. 170-71; Ohanian Rebuttal Report, App. 194-95.

. Beyer Report, App. 26-27 ("The increase in Northwest’s [Minneapolis] hub premium from 21 percent in 1993 to 46 percent in 1994 is substantial.... The substantial increase in Northwest's [Minneapolis] hub premium between 1993 and 1994 indicates that Northwest changed the way in which it was exercising its monopoly power.... Northwest’s [Minneapolis] hub premium increased so significantly because Northwest appears to have changed the way in which seats on its airplanes were allocated amongst the various fare classes.”); Ohanian Report, App. 166 (contrasting fare premium charged by Northwest on Minneapolis flights in 1993(21%) with that charged in 1994-97 (40.3%)).; Dep’t of Transportation, Low Cost Airline Revolution, supra, at 29 (comparing hub fare premiums at Minneapolis for 1988(23%) and for 1995 (40.8%)); Ohanian Report, App. 169 (showing that Northwest’s profit margin for twenty major Minneapolis markets went from 0.9% in the first quarter of 1993 to 15.5% in 1994-97); "[B]y the third quarter of 1998, travelers using [the Minneapolis] airport were paying the third highest fares in the nation.” Paul Stephen Dempsey, Predatory Practices and Monopolization in the Airline Industry: A Case Study of Minneapolis/ St. Paul, 29 Transp. LJ. 129, 131 (2000). But cf. Minnesota Planning, supra, at 7 (“Boren-stein's analysis shows that fare premiums paid by Northwest customers in Minneapolis-St. Paul increased dramatically between 1989 and 1990, and have remained high since then.”).

. See discussion infra at 8-9.

. Strong Report, App. 201-38, discussed in detail, infra, at n.25.

. Compare II Phillip Areeda, Herbert Hoven-camp, & Roger Blair, Antitrust Law § 320c5 (2d ed. 2000) ("[A] continuing violation occurs when the defendant uses the merger in a way that is not inherent in the acquisition itself. For example, suppose that a merger gave a firm the structural power to engage in predatory pricing. A damages action challenging such a merger would fail as long as predation were merely possible or even likely. As a result, the statute of limitation would not run on such a damage claim. However, once unlawful predation began and the plaintiff could show the merger facilitated the predation, then the statute of limitation would not bar a challenge to the merger itself Whether the distinctive use is referred to as a continuing violation or different holding and use, the idea is the same.

. Ohanian Report, App. 152-55; Strong Report, App. 237 ("The hub dominance and corresponding market power was firmly established by 1994 ....”).

. See footnote 1, supra.

. Northwest Airlines, as a result of its acquisition of Republic Airlines in 1986, was able to establish and sustain a service network .that includes dominant hub airports at Minneapolis-St. Paul (MSP), Detroit Metro Wayne County (DTW), and Memphis (MEM).” Strong Report, App. 200.

. Ohanian Report, App. 166-67 (citing two reports: one comparing 21% premium in 1993 to 40.3% premium in 1994-97; and the other comparing premium of 23% in 1988 to figures of 41% and 44% in 1995 and 1997, respectively).

. Ohanian Report, App. 170.

. Dempsey, supra, at 139-40 ("The DOT’s highly permissive policies with respect to mergers led to an explosion of such activity.... Many of these mergers were approved under the then-prevailing (and since discredited) neo-classical economics view that 'contestability' of markets would arrest any anticompetitive conduct. The Northwest-Republic and TWA-Ozarlt mergers were vigorously opposed by the U.S. Department of Justice [DOJ] on grounds that they would create hub monopolies at Minneapolis and St. Louis, respectively.”).

.
Proponents of deregulation believed that airline markets were "contestable,” that is, new carriers could easily enter markets because airlines’ key resources-airplanes-are highly mobile. As it turns out, however, other equipment and facilities needed to serve a route-especially gate space-can be difficult and costly to obtain. Facilities may also be limited for ticketing, baggage handling, operations and maintenance.
Minnesota Planning, supra, at 13.

. Strong Report, App. 208-10, 218. Cf. Levine, supra, at 477 ("The complex fare structures with computerized capacity controls which have come to dominate the industry play an important role in these competitive tactics.”).

. Strong Report, App. 201; Dep't of Transportation, Office of Aviation and International Affairs, The Low Cost Airline Service Revolution 3 (April 1996) ("[S]ince early 1993, the pace of this major evolutionary development [the “advent of low-cost carriers”] has dramatically quickened.”).

. Strong Report, App. 216-17.

.
A specific pattern of anticompetitive behavior began to be apparent in 1993-94 and continued thereafter. These practices include capacity "dumping” of low fare seats and flight frequencies, "bracketing” of flights, restrictive controls over gates at its fortress hub airports, targeted frequent flyer and travel agent incentive programs. These practices serve to make sustained competition much more difficult for low-fare carriers, especially new entrants who do not have the size or network operations of Northwest or the financial resources to withstand prolonged periods of such anti-competitive behavior.
Strong Report, App. 203 (footnote omitted). Strong’s list of Northwest's techniques to drive new entrants out of the market included some actions that were directly dependent on controlling facilities at Minneapolis (“Restrictions on gates or facilities (e.g., counters, operations offices) that prevent a new entrant from being able to launch competing service”) and others that capitalize on Northwest's ability to offer more flights ("Scheduling departures in close proximity to the new entrant’s flights, known as 'bracketing.' ”). This technique was described in an article by Michael Levine: “Add frequency where possible, to 'sandwich' the new entrant’s departures between one's own departures.” Levine, supra, at 476.

. Strong Report, App. 218-20 ("As a major airline, Northwest’s ability to sustain such revenue losses is likely to be much greater than a smaller entering carrier.”). Cf. Levine, supra, at 477 ("The object is to reduce trial and to subject the new entrant to a prolonged period of operation at low load factors. This strategy saps the entrant's working capital .... ”).

. Strong Report, App. 218.

. E.g., Strong Report, App. 223-24 (during time Vanguard Airlines competed on Minneapolis-Des Moines route, Northwest charged prices below variable cost).

. Although Midwest has not pointed to much specific evidence of what particular Republic assets were used, the record does Contain evidence that would allow a finder of fact to conclude that, for instance, Northwest implemented its new strategies using Republic’s DC-9's and gates gained in the merger. Beyer Report, App. 22 (Northwest controlled approximately 75% of gates at Minneapolis after merger); Richard Ihrig Affidavit, App. 7-9 (summarizing evidence that DC-9 aircraft gained in merger were used to add flights on challenged routes).

. Strong Report, App. 221-22 (generally), 225 (when Vanguard entered Kansas City-Minneapolis market, Northwest increased number of flights on the route by 48% and number of seats by 53%); 230-31 (when Sun Country Airlines entered Minneapolis market, Northwest added 33% to seat capacity of challenged routes in two years, whereas rate of growth for previous five years was 1%; increase was almost five times the number of seats offered by Sun Country on route); cf. Levine, supra, at All ("If circumstances (including the financial condition of the new entrant) warrant, the incumbent can flood the market with low-priced seats, withdrawing them almost invisibly at peak times or as competitive conditions allow.”).

.Strong Report, App. 223-24 (Vanguard airlines); 232 (after Kiwi International was forced from Minneapolis-Detroit market, Northwest changed fare from $69 to $467).